Please call the next case. I'm going to try again. I would like the appellant to come forward this time. And even in this case, it's a little confusing, doesn't it? Because we have a cross appellant. You get 15 minutes on a side. You have to deal with both sides of your argument during your allotted time. Whenever you're ready. Please identify yourself. Yes. Good morning, your honors. Edward Switzer appearing behalf of the better Jordan Schultz. It was the appellant and the cross appellee in this matter. How much time do you want to reserve for rebuttal? Five minutes. Okay. You have that. Again, you've got 15 minutes to address all of your arguments. Both your cross appeal and matters on appeal. Please proceed. The court's indicated you're familiar with the briefs, so you know what the facts are. You know that the debtor was mentally disabled during the entire period of time that's subject to this case, that the court found him to be mentally disabled to the extent that he could not form the fraudulent intent necessary to defraud creditors or trustees on two of the items that were at issue. The third one, the third item was the email list of his corporation. I think where this case seems to, for the debtor's perspective, went off the rails is the valuation of that email list. That seems to be a real serious problem here because I think the court erred in not considering the context that that list was used, the fact that when he was running his corporation and using his name, his face, his voice, his webinars to sell these products, he was, according to the plaintiff in the pleadings, was the product. That's what he was selling, and he made a lot of money. They made a lot of money on his name and on his brand, on his product. And when he, in his webinar, told people listening to the webinar that they could build a list like his that was worth a million dollars if they followed his computer internet advertising instructions. But then when he went through this period where he was just mentally out of touch with And he contacted someone that was in this internet field, marketing field, this niche that he was in, affiliate marketing, and asked him for the value. He gave it. He gave him the value. We put it down at a per name and email list value. And the value was a million dollars versus $783. So that's what I think really bothered the court. But the fact is that the court didn't consider that at the time of the bankruptcy filing, that list to a third party that wasn't able to use his name, his face, his voice, and his products was just a list of email names. So there was going to be a substantial difference in value from when he gave it the first time and when we put it down in the petition. And based on that, that caused the court to believe that he was trying to defraud the creditors. But from the facts of the case, both from my paralegal was very familiar with him, this young man had a terrible, terrible time just understanding the basic instructions. He was forgetful, erratic, confused, lacked focus, unable to think logically, and unable to connect the dots. And the court found that to be persuasive with the other two items, a Rolex watch that was valued at $100 and a Bitcoin account that was forgotten or omitted and not put in the petition. But for the email list... Why didn't you just put unknown as the value for the list? I'm sorry? Why didn't you just put unknown for the value of the list? I thought about that once I saw the court's opinion and the newer forms actually have a block for that. I never put down unknown on a bankruptcy petition because our trustees just don't let you get away with that. You've got to put some value on it. The trustee is going to say, tell me how much it's worth, give me some idea. And generally speaking, we go to blue books, we go to certified appraisals, we go to Zillow from time to time to get some kind of value. Because as this court knows, bankruptcy cases are generally tried somewhat on a shoestring. We can't go out and hire experts for everything. And honestly, it just seemed like that divergence in value was more like the goodwill in a business. That if the sole proprietor leaves the business, it has very little value other than his truck and his tools. So that's why I think we didn't do an appraisal on it. In hindsight, so many things I would have pumped into this case to make it clear what we believe happened. Well, your position is that the valuation that you used on the schedule was a good estimate of what the value was. Under these circumstances, it was. Now, the problem is we have a third party that I've never met, never heard of until right at trial that put that value down there. But the client has always maintained it. You're talking about the Nigerian? The Nigerian. The client has always maintained that the list had value to him and not anyone else. And matter of fact, he would say it had no value to anyone else. That's just the way he was looking at it. We're talking about an asset in a corporate bankruptcy, not an asset in his personal bankruptcy. That is correct. But he was an insider. He filled out those schedules. He was the sole operator, shareholder of that business. There was no one else. And he was responsible. He signed the schedules. He's the one we went to for information. But he had assistance, a personal assistant, basically, from his business that was trying to help him prepare the schedules. She worked closely with my secretary, Joanna, whose testimony I've cited in the briefs. Joanna worked closely with him. So he had people assisting him, gathering information, putting it down, just getting him to the appointments on time was a challenge. The court made a finding of intent to conceal the value. Yes. Can't you generally draw an inference of intent from the party's motive? And didn't he have a motive to assign a low value to this so the trustee's more likely to abandon it? Honestly, with this guy's mental capabilities, his lack of ability to think logically, to plan that far out, to understand the bankruptcy process to that extent, I think it would be nearly impossible for him to plan and ferret that kind of thing out. He was planning to go out and start a new business in the future using the same method he started his first one, with the affiliate marketing, to get these affiliate marketers to market it, and then he pays them half of the proceeds if the product sells. So he'd done it before. He knew how to do that. That was not even in the cards. And there was never an issue of him, you know, using this email list all the way through from his old bank, old corporation, into the new corporation. It was only after this was abandoned months down the road, after the chapter, the corporate found that that was kind of a badge of fraud, just using the list after it was over. So you're saying the judge made an error, a factual error, which is the clearly erroneous standard, and she was the one who was there to assess his credibility, the credibility of the other witnesses, the psychiatric witness that you had in terms of his mental state. So how can we find error in what she did? Well, the credibility, she basically, in her opinions, says that he's not credible because he believes that the list has a high value for him, but a low or no value for anyone else. So she's saying that because he believes that there's a great discrepancy of value, that's not credible. That's the main reason she uses in the opinion. And that's the, you know, I cited, I think, the... Can I ask you a question on a different subject? As I've gone through the record, I can't find a single piece of evidence regarding the value of this property that would have been properly admitted had somebody objected to it. Why were there no objections? Well, it seemed the owner could give his opinion, I would expect, and it was, I think it was not objected to because I felt like the plaintiff's opinions were for what they're worth. I mean, he never said it was a million-dollar list. Well, he said that he got a basis for his value from some third person. That would not be admissible. Mr. Shugart said it was worth a million dollars, but it seemed to me, in retrospect, that was just speculation. None of that would have been admissible if somebody had objected. Well, I think, in hindsight, you're right. I probably should have objected to that because nobody had any expert witnesses to testify on the value. So it seems like the debtor's value is a legitimate value. What is the evidence? The judge at some point drew the inference, as Judge Ferris suggested, that when he put a low value on this customer list that he had an intent to defraud or intent to deceive because he knew it would come back to him. Was there some evidence of that in the case? None, zero. But it did come back to him. The only evidence that tends to focus on that is that the court pointed out that they had a large discrepancy between the million dollars and the $783. And that, she said, could raise an inference that he intended to defraud. But back to my earlier point, if the value of that list was low... Counsel, you have five minutes left. Do you want to reserve that? Yes, Your Honor. Thank you. Please identify yourself. Patrick Downs, Counsel for Appellees and Cross-Appellants, Keyword Rockstar, John Shugart, and Luke Sample. May it please the Court. I'd like to address Your Honor's first comment about the lack... Yeah, I saw you react to that. You thought there was admissible evidence. I've actually brought an exhibit on PACER. It's document 12-8. It was also a trial exhibit. The court references a presentation that the debtor gave where he, the e-mail list, is valued at a million dollars. This would be admitted, if there were an objection... He was saying at a seminar in which he was trying to sell somebody something, that you can build an e-mail list worth a million dollars. He had built. He's talking about himself. So this would be an exception to the hearsay rules. So how much did the trustee sell it for? Abandoned it. How long did he wait before abandoning it? A couple weeks, I think. And it's not just the trustee. You have to give notice to creditors. And the fact that the creditor thinks... Well, at the abandonment, your client received notice, right? That's true. So if the trustee, you know, why didn't your client go in and buy it for $2,000 or $5,000 or $10,000 for selling this really valuable asset? Well, because we have separate litigation on that issue. We arguably also have the list already, because we were in a joint venture with him. So, you know, our need to use his list is not so great. So what you're saying is you owned it and he didn't? Or it's jointly owned? Or it's both owned? How does that impact value? Well, it's certainly more than $800 in terms of the disclosure to the trustee. He discloses it as being $740. So in order to win, do you need to prove just that it's worth more than $800? Or do you need to actually establish a value? Because it's your burden of proof to establish the false oath. And in order to establish the false oath, you have to show that he improperly valued the asset. What if it's worth $900? Well, I think the trial court got it absolutely right, talking about when there's an asset that has a range of values, you can't pick the lowest. And you have to at least pick, you know, what would be a midpoint valuation, which is what she discusses. Is that the rule? I thought the rule was that it had to be a reasonable estimate of value. I think you have to give fair disclosure to the trustee and the creditors. And whatever that amount is, it's not $700 based. When you're running around telling people you think it's worth a million dollars, your actual belief is a million dollars. And then you turn around and when it's a bankruptcy, suddenly it's $700, because somebody in Nigeria helped you, you know, deliberately. Well, let's put it in context. First of all, it's not an asset in his personal bankruptcy, right? He's not claiming an example. He listed it in his corporate bankruptcy. He listed it in the corporate bankruptcy. So whatever the value is, it's something owned by the trustee, is that correct? Whatever the value is, it's something owned by the corporate trustee. And so the trustee is free to sell it, abandon it. No other entity is making a claim of ownership on it, is that correct? And as I understand it, its ownership is disputed by you. That's right. Also, it's an entity, a customer list that is associated with a person who no longer will be available to market it. Is that correct? He marketed it. Well, I mean, if the trustee sells it, the trustee is selling it without that marketing, right? That's right. It would be without the marketing of him. That's right. So there's some reasons to discount the value, right? Discount. We're not saying that it needed to be recorded at a million dollars. But $700 doesn't give anyone fair notice as to its value. And that was borne out, as the court saw, when he started his new business with this list. That generates over six figures in sales based on this list. And he receives $57,000 from this list. For him? For him. Because he was the person who was doing the selling? Probably. Probably. Or his company. Yeah. Or his company. So how does that indicate the value of it in the hands of the trustee? It doesn't have him, the debtor, to do the sales? The trustee could have, as we talk in our brief, if the trustee felt that Mr. Schultz could make $57,000, $67,000, that would give the trustee potentially some insight as to the value of this with the right spokesperson, potentially the trustee. But didn't the trustee have the prepetition tax returns? Didn't the trustee know how much the debtor had made from the list? Yeah, but wouldn't have necessarily known it was from this list that's only worth $700. I'm not sure how much insight. You know, it's guesswork. And we shouldn't bear the unknown in terms of what the trustee knew or didn't know. That shouldn't fall on us. Let me change the topic a little bit to the intent question. I'm struck by the fact that the judge, and I'm paraphrasing here, basically found that he didn't have the intent to defraud with respect to the watch because he had these mental issues, but he definitely had the intent to defraud with respect to the list, even though he made those disclosures at essentially the same time and presumably was suffering from the same mental problems at that time. Those just don't line up for me. Well, I think the trial court would point to the fact, and it's in the memorandum, that there was some deliberation and consideration when, if Mr. Schultz is to believe, he spoke to his friend in Nigeria to consider what the valuation was and assess it, knowing that in the right hands it's worth a million dollars if you're selling the right product. So that's one answer. The second answer is, given the magnitude of this asset, this was probably the most important asset that JWS had, this email list, that had been built up and had been successful. And, you know, in the right hands, it generated $6 million over two years. I guess that's the issue. What's the value of the list? What's the value of the hands? Yeah, yeah. And in any event, there's no reason to think it's worth $700. Explain to me why it's not worth what he said it was worth in the hands of the trustee. Because Mr. Shugart testified a probable list is worth, you know, $12,000. Worse list than this one is worth $12,000. And that was the transaction where he couldn't identify the parties? Potentially. I mean, you're familiar with that. And you would concede that evidence was not, if properly objected to, would not have been admissible? I'm not sure. I don't think I concede that.  The testimony was it was offered to him for $12,000. He turned it down. He later heard from somebody that somebody else had bought it for $12,000. Sounds like a lot of hearsay. It could be. It could be. But we still have the. . . You know, you get to bring in evidence of other sales when they're comparable. And the first thing he said, this one's not comparable. Yeah. Makes it inadmissible. Yeah. Well, we have, you know, we have the owner's admission as to the email value to him. And when you're listing assets, you arguably have to list what their value is to you. Why is that? Because I think that's a relevant fact for the trustee. I think the trustee would want to know, oh, in the right hands, this list could be potentially valuable. In whose hands was it? JWS, a company's. And the Chapter 7 trustee? Yeah. So why is it not reasonable to say that in those hands, on the petition date, without the assistance of the debtor, without the face of the principal of the corporation, that its reasonable value was exactly what he said it was? Because the trustee could find somebody else, could even potentially negotiate with the debtor himself. You know, the product wasn't just Jordan Schultz. It was his ideas on how to make money on the Internet and then coaching that he would give. Somebody else could do that, too. But also encumbered by your litigation about ownership, right? True, but still worth more than. So that's a clout that has an impact on value. Yes, but as the court found, worth more than $700. Is it troubling or should it be troubling to us that the judge kind of did what you did here today in argument, which is basically saying given the fact that at some point in time he speculated as part of his salesmanship that his mail list was worth a million dollars under those circumstances with him selling it, that somehow it's got to be worth more than in the hands of the trustee. It's got to be worth more than he listed it in the schedules. Isn't that just speculation? What's the basis? What's the evidential basis for that? Because if this email list. Counsel, you can bring that up 200 times. It's not going to be any more persuasive than this. I'm sorry. But if the email list truly is worth a million dollars, used properly, which is true, it made $6 million over two years. It did. OK. The trustee doesn't know. Trustees sell things. They don't necessarily. The trustee is not going to go on the Internet and, you know, use something themselves. They're going to go try and sell it. But didn't your guy, if I remember correctly, testify that he did not know of any list selling for a million dollars? We're not suggesting that it's actually worth to the trustee a million dollars. I thought that's why you were holding up that figure. Well, to show for sure it's worth more than $700. Yeah, but then your job is to show that there was a false oath and that it was material. All right? If you don't tell me what the value is other than more than $700, how do I assess whether it's material? Or where the market is. Because I think the trial court and the evidence, you know, that was admitted, OK, and we can place second guess as to if objections have been made, but we're not going to do that. The evidence that was admitted that she evaluated, she believed that it's worth, you know, some midpoint, higher than $700 and was lowered in order to lie to the trustee based on, you know, texts that he had told our client that you're never going to get a dollar, OK, based on the amount of times he met with her paralegal, eight times the number of amendments that were made, the size of this asset, he must have known, he did know it was worth more than $700. He didn't tell anyone that because he was trying to get it through so that nobody bothered him, and then he could use it again. And that's exactly what happened. Let me ask you one more question. Your client was a creditor? Yes. And so you're suggesting that in a bankruptcy in which the principal creditor was his partner, that he could somehow effectuate a deceit about the value of the customer list, particularly when it's a customer list that the partner alleges an ownership interest in? How would that work? I think it worked exactly how it did here. He put it on the schedules at $700. So he fooled both the trustee and the creditors, including your client? Well, we're not fooled. We're in litigation with them. But, you know, there's other creditors that are listed. Well, my question is to you that what you're suggesting is something that seems to me to be very implausible, which is to say that he came up with a scheme to fool his trustee and his creditors about the value of his customer list when his principal creditor was his partner, your client. How does that work? How is that plausible? Well, it's plausible because the trustee, you know, let it go based on the disclosure. Yes, we're suing him. Didn't the trustee have rational reasons for doing that? Didn't the trustee say, first of all, there's no market for this, and secondly, it contains confidential information and I don't want to be involved in selling it? Based on a valuation of $700. But it's guesswork as to whether if the trustee had known it was really worth $1 million to somebody else. I'm struck by the fact that your client opted not to go to the trustee and say, I'll offer you $1,000. That buys you out of that litigation over who owns the list, right? But that litigation involves more than just that list. They also ask money. Sure, but it takes one issue out of that litigation, which is usually if you can get rid of it for $1,000, that's probably a good deal. Yeah. You didn't do that. Yeah, but that should not allow a creditor to get away with not revealing the actual belief as to what an asset's worth, first of all. And second of all, on our cross-appeal, if I may briefly, the largest withdrawal made in this case was $250,000. That was not explained other than his accountant to say it's a cashier's check, and I have no idea where that went. We think under 727A5, when we identify a transaction, and this was the most material one, single one, somebody on their side had to explain where it went. Nobody did. The accountant relies on Mr. Schultz, where it's booked just to advertising. Without any idea as to what vendor it is, a cashier's check is inherently implausible as payment in an even amount to a vendor. The trial court's order doesn't address the cashier's check, and there's no explanation sufficient to satisfy it. What the trial court said was that you hadn't met your burden of proof on that issue. Is that correct? Without addressing that transaction. That specific transaction. Yeah, just generally, oh, everything's explained. They don't like the answer. But that's not true, and that's demonstrably not true. The bookkeeper said that probably it was for advertising. Is that what he said? Yeah, but to whom? I don't know. We don't know. There's no invoice, and that's just based on Mr. Schultz's say-so. There's no suggestion of who deposited it, where it went. They knew it was coming. We asked them about it in deposition, and at trial, we didn't know it was a cashier's check until we heard from trial, from the accountant, that that's what it was, but nobody knows where it went. And, you know, $250,000 is clearly material, and not being able to explain where it went fails to satisfy 727A5. I've given you a couple extra minutes because I felt you needed some time on that issue. Thank you very much. Thank you, Your Honor. Counsel, do you have more time? Yes, just briefly, Your Honor. First of all, I don't know that I answered Judge Brandt's question on the credibility of the debtor. I don't remember my question, so you can just go on. I don't remember my question on that, so you can go on. It seemed to be basically that what did the judge find regarding his credibility and what did she base it on? And the credibility decision, she said he's not credible on this issue because of his valuation, and she actually set that out, and there was that, the valuation of value at low now and high six months to a year ago is when that video was filmed. There's a discrepancy there, and he didn't explain it, other than to say it was worth more to him than it was to other people. That was the basis. There's nothing else in the record that I could find that shows anything that would indicate he was trying to deceive or mislead the court. Is it your position that in valuing this customer list, what your client was saying that it is reasonable to evaluate it at $700 because absence of my personal participation and association with the list, it has literally no value to anyone else? That is correct, sir. And that while someone could reasonably disagree with that, my position is still reasonable under the circumstances, particularly in view of the fact that the trustee, is it really two weeks later the trustee abandoned it? How long did it take the trustee to look at the list and decide that the trustee didn't want to keep it? It was several months down the end of the case. It was, I think, August. It was filed in March. What was the motivating factor for doing an act of abandonment? The motivating factor, according to the trustee, was the ongoing litigation over the ownership and the privacy confidentiality concerns, which actually could lead to having to appoint an ombudsman to determine the privacy policy of the corporation. She didn't state that, but that's what privacy generally means with a mandate like this. What was to prevent you from using the list, your client, from using the list after the bankruptcy was filed? Was there some kind of exclusive rights in the corporation? No, there wasn't. As a matter of fact, the understanding, and this was an oral, a verbal contract between the parties, so it's a little bit up in the air, but there was a Skype transcript that covered almost the first year of their discussions. But the understanding was that that list was to remain, Jordan Schultz's list, throughout this proceeding. They were moving under just basic we were a partnership, therefore whatever you had, I had theory, but the understanding between the parties under their oral contract was that the list was to remain Jordan Schultz. And Jordan Schultz had his corporation, JWS, use it, and now apparently has a new corporation that he's allowing to use it. Slightly different question. The testimony was that in your worksheets that you prepare for your clients, you ask them to put yard sale values on stuff, and that struck me because that's precisely what I told my clients to do when I did the occasional consumer case. What about the midpoint approach, however, the court seemed to be taking? What's your reaction to that? I've really never tried to bracket something. I try to be as honest with the client, have the client express his views as to why it's worth what it is, and if there's anything that I could add to enlighten the court from available, public available sources that didn't cost us a lot of money, but that's what we tried to do. Splitting the value, you know, maybe on an occasional situation, it was kind of an eye of a beholder type of case, and honestly in this case with this value, I wasn't offended by it. It just seemed to be, okay, this thing's not an operating business anymore. It's just a list of names. It just didn't strike me as being that much of an issue, and most of the causes of action in this complaint were just information and belief anyway, so it was kind of the complaint was throw everything against the wall and see what sticks. So I really didn't think that was the more critical issue. I thought the bitcoin certainly would be the most critical issue in the case. Counsel, you can have another minute to discuss the cashier's check. The cashier's check was for an advertisement. The accountant testified as to his procedures to determine what every payment was for, and if it wasn't obvious on the face of the item, he would call the debtor at that time, usually within two weeks of the bank statement coming out, and ask the debtor what that was for, and based on the debtor's recollection, would put down what it was for. If he didn't know, then it went into shareholder distributions, which was basically not a business expense. He also explained that he got all of the client's financial data directly from the banks and the financial institutions sent to him himself, so he saw everything that was done on the debtor's books throughout personal and business because he did both the personal and business tax returns, and nothing was out of line. The plaintiff in the case actually testified that he had gone through the books and documents that we prepared and determined that $526,000 was for advertising, and in that accounting was actually this $250,000 check. It was already listed in there. The last thing I'd say about that $250,000 check is that they really never mentioned that check with any specificity until trial, not in their pleading. It was basically what happened to $4 million or just a generic large amount of money. He had money back then. They call it net worth. Of course, it was never net worth. And now he's filing bankruptcy, so where did the money go? That was their gist of that complaint of that cause of action. Well, as I understand their case, there is some reason to be concerned. I mean, the client files bankruptcy, but a few years earlier had been making hundreds of thousands of dollars, and at the time of the bankruptcy, it's kind of mysterious where everything went. But the judge resolved that by just simply saying that maybe it's so, but I just don't have enough evidence here to resolve this issue on a 727 dischargeability case, which is a rational decision. That is what happened. Thank you, Counsel. Thank you. This matter is submitted. Thank you very much for your excellent argument.
judges: Kurtz, Faris, Brand